NOT DESIGNATED FOR PUBLICATION

No. 127,844

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

RONALD LEE KIDWELL,
*Appellant.*

MEMORANDUM OPINION

Appeal from Johnson District Court; TIMOTHY MCCARTHY, judge. Submitted without oral argument. Opinion filed August 14, 2026. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant, and *Ronald Lee Kidwell*, appellant pro se, was on the supplemental brief.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., ATCHESON and CLINE, JJ.

ATCHESON, J.: Ronald Lee Kidwell ostensibly ended a five-year legal odyssey when he pleaded guilty to a reduced charge of voluntary manslaughter in Johnson County District Court. Ever an obstreperous defendant, Kidwell went through multiple appointed lawyers, oscillated between representing himself and wanting a trained legal advocate on his side, and peppered the district court with his own motions even when he had counsel. True to that form, Kidwell drafted and filed his own motion to withdraw his plea before sentencing, despite having legal representation at that stage of the case.

1

In an unusual twist, the State did not oppose Kidwell's request and declined to directly challenge the evidence he presented to the district court at a hearing on the motion. Exercising its independent judgment, the district court denied the motion and later sentenced Kidwell in conformity with the plea agreement that reduced the original charge of intentional second-degree murder and included a joint recommendation for a 222-month prison term on the voluntary manslaughter conviction.

On appeal, the Appellate Defender Office contends the district court erred in denying Kidwell's motion to withdraw his plea and incorrectly treated two of his convictions for second-degree assault in Missouri as person felonies in determining his criminal history score. In his own supplemental brief, Kidwell argues that the denial of his motion to withdraw his plea permits him to contest various pretrial rulings despite his guilty plea. We find no error and, therefore, affirm Kidwell's conviction and sentence.

FACTUAL AND PROCEDURAL HISTORY

Given the appellate issues, we offer a condensed version of the underlying crime. In early July 2018, Kidwell got into a physical altercation with a woman he knew. He has described her as his girlfriend. The woman died from a knife wound to the neck, and Kidwell hid her body and cleaned up his residence to obscure evidence of her death. The woman's family became concerned and reported her absence to the authorities. Law enforcement officers contacted Kidwell. And he ultimately told them where to find the woman's body.

Kidwell has offered conflicting accounts of the woman's fate. Initially, he told the investigators the woman wasn't "missing" but was holed up at a drug house in Kansas City, Missouri. During the same six-hour interview, Kidwell then said he and the woman were in Kansas City, Missouri, when several individuals he did not know set upon them, beat the woman, and had apparently cut her throat. Kidwell claimed he did not appreciate

2

the severity of the wound until they got to his home. According to Kidwell, the woman refused to go to the hospital and died. Still later in the questioning, he told the officers that he and the woman got into an argument at his residence, and she threatened to tell everyone he was HIV positive. Kidwell said that angered him. The woman then grabbed a knife from her purse. In that account, she attacked Kidwell with the knife. He explained to the officers that he and the woman twice wrestled over the knife. Kidwell said that in his angered state during the second confrontation, he forced the knife—still in the woman's hand—to her neck and cut her.

In papers Kidwell drafted and filed in the district court, he refined his account of the woman's death to suggest he acted in self-defense. In that version, the woman had been drinking and likely had ingested illegal drugs. In a highly intoxicated condition, she attacked him with the knife for no apparent reason. Kidwell represented that the two wrestled over the knife as he physically defended himself and that she fell to the floor, causing the fatal knife wound in some manner.

The State charged Kidwell with intentional second-degree murder, a severity level 1 person felony violation of K.S.A. 21-5403. Kidwell's conflicting statements to the investigating officers provided the backbone of the preliminary hearing evidence used to bind him over for trial on that charge. Throughout the case, everyone believed that Kidwell would have a criminal history score of B, so he likely faced a presumptive guidelines sentence between 554 and 618 months in prison.

Kidwell's appointed lawyer—his third in the case based on the district court's comments and a brief review of the record—finalized an arrangement with the State in January 2024 that called for Kidwell to plead guilty to voluntary manslaughter, a severity level 3 person felony violation of K.S.A. 21-5404, with a joint recommendation for a 222-month prison sentence regardless of his criminal history score. Kidwell signed a written plea agreement reflecting those key terms. As we have suggested, over the course

3

of the case to that point, Kidwell had filed numerous motions challenging, among other things, the constitutionality of the search of his home and of his interview with law enforcement officers.

At a hearing in late January 2024, the district court went over the plea agreement with Kidwell and his lawyer. Kidwell acknowledged reviewing and signing the written agreement and informed the district court he was satisfied with the services of his appointed lawyer. The district court briefly explained the rights Kidwell would be giving up by pleading guilty and advised him of the maximum possible sentence for voluntary manslaughter—a prison term of up to 247 months and a $300,000 fine. The State offered a factual basis for the plea by referring to the preliminary hearing evidence and the inculpatory statements Kidwell made to law enforcement officers. Kidwell told the district court that those representations were substantially correct and that he chose to plead because he was guilty of the voluntary manslaughter charge. He represented that no threats or promises had been made to him to induce his plea and that he was pleading voluntarily. The district court then accepted Kidwell's guilty plea. The district court never advised Kidwell that the 222-month sentence outlined in the plea agreement was merely a recommendation that it was not obligated to follow.

The lawyers and the district court then discussed some issues that might come up at sentencing, especially if Kidwell had a lower criminal history score than anticipated. The district court asked Kidwell if he understood the discussion, and he said he was "kind of confused" because he thought he was going to get a sentence requiring him to serve an additional "like, 10 years and two months." The district court did not directly address Kidwell's apparent confusion, although his lawyer told him he would be entitled to a hearing on any upward departure sentence.

About six weeks later, Kidwell filed his motion to withdraw his guilty plea. The district court appointed substitute counsel for him. Kidwell's new lawyer filed an

4

additional motion to withdraw the plea. In its written response, the State submitted the district court should allow Kidwell to withdraw his plea, thereby permitting the State to reinstate the second-degree murder charge. The State cited Kidwell's claim of self-defense and his assertions that his lawyer had been impermissibly ineffective leading up to the plea. And the State suggested that denying Kidwell's motion could create an inordinate delay in ultimately disposing of the case if that ruling were reversed on appeal.

The district court declined to rule based on the written submissions and set the motion for an evidentiary hearing. Kidwell testified as the sole witness in support of his motion. The State neither cross-examined him nor offered any countering evidence. In his testimony, Kidwell referred generically to witnesses he had wanted his appointed lawyers to call at the suppression hearing and for trial. But he did not otherwise explain what they would have testified to or how that testimony would have advanced his legal arguments. He also faulted his lawyers for not pursuing self-defense immunity under K.S.A. 21-5231. Kidwell testified that leading up to the trial, the lawyer then representing him repeatedly told him that the district attorney would ask for a 50-year sentence if the jury convicted him of second-degree murder. Kidwell said that stark advice left him fearful and feeling as if he had no choice but to plead guilty to the voluntary manslaughter charge.

In her closing remarks, the prosecutor told the district court the State was not taking a position on the merits of Kidwell's motion to withdraw his plea. But rather, the State concluded there was some chance that a denial of the request might be reversed on appeal and the appellate process would delay any final resolution of the case for an extended time. So the State submitted that on "a cost[-]benefit analysis," it preferred to go to trial promptly on the original second-degree murder charge and urged the district court to grant the motion for that reason.

The district court concluded that under K.S.A. 22-3210(d)(1) it was required to independently determine whether Kidwell had shown "good cause" to withdraw his plea notwithstanding the State's acquiescence in the request. The district court cited the governing legal standard, concluded that Kidwell failed to establish sufficient grounds to withdraw his plea, and denied the motion.

At a later hearing, the district court followed the plea agreement and sentenced Kidwell to serve 222 months in prison followed by postrelease supervision for 36 months. The presentence investigation report identified two Missouri convictions for second-degree assault and treated those as person felonies, giving Kidwell a criminal history score of B. Before the hearing, Kidwell's lawyer did not object to the criminal history as outlined in the PSI report and, at the hearing, agreed that history established a criminal history score of B. The 222-month sentence fell within the presumptive guidelines range for a defendant with a criminal history score of B convicted of voluntary manslaughter. Kidwell has appealed.

LEGAL ANALYSIS

*Denial of Motion to Withdraw Plea*

Kidwell contends the district court erred in denying his motion to withdraw his guilty plea. Under K.S.A. 22-3210(d)(1), a district court may permit a defendant to withdraw their plea in its judicial "discretion" for "good cause" shown before sentencing. District courts should look at three primary factors to determine if a defendant has shown good cause to withdraw a plea: (1) whether the defendant was represented by competent counsel; (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) whether the plea was fairly and understandingly made. *State v. Rayton*, 321 Kan. 677, Syl. ¶ 3, 583 P.3d 898 (2026); *State v. Garcia*, 295 Kan. 53, 62-63, 283 P.3d 165 (2012) (noting that these considerations—commonly known as the

6

*Edgar* factors—establish a sound benchmark for determining good cause); *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006). All three factors need not favor the defendant to permit relief from a plea, and the district court should consider other relevant circumstances based on the facts of the particular case. See *Garcia*, 295 Kan. at 63 (district court not confined to *Edgar* factors); *State v. Williams*, 290 Kan. 1050, 1054, 236 P.3d 512 (2010) (all of the *Edgar* factors need not favor defendant; court may consider other circumstances).

Because the governing statute expressly affords the district court discretion in ruling on a defendant's motion to withdraw a plea before sentencing, an appellate court reviews the determination for an abuse of discretion. *Rayton*, 321 Kan. at 686; *State v. White*, 289 Kan. 279, 284-85, 211 P.3d 805 (2009). A district court exceeds that broad authority if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. *Rayton*, 321 Kan. at 686; *State v. Shields*, 315 Kan. 131, 142, 504 P.3d 1061 (2022). Kidwell bears the burden of establishing an abuse of discretion. *Rayton*, 321 Kan. at 686.

The district court recognized the *Edgar* factors and, therefore, considered the proper legal standard in denying Kidwell's motion. We turn to those factors and ask whether the district court otherwise abused its discretion in denying the motion. In assessing whether Kidwell received competent legal representation, the district court had to determine if that representation rose above "lackluster." *Rayton*, 321 Kan. at 687. On appeal, we do not substitute our judgment for the district court's on that point and ask only whether the determination amounted to an abuse of judicial discretion. 321 Kan. at 687.

As we have outlined, Kidwell testified at the hearing on his motion that his lawyers failed to call appropriate witnesses at various proceedings, including the motions

7

to suppress evidence and his highly incriminating statements to the law enforcement investigators. He likewise faulted his lawyer for not subpoenaing a particular witness for trial. But in each instance, Kidwell never detailed how those potential witnesses might have furthered his legal positions before or during trial. Based on those vague assertions, the district court properly concluded Kidwell's legal representation was sufficient in that regard.

Kidwell's claim that his lawyers should have sought self-defense immunity for him ahead of trial similarly wilts. Under K.S.A. 21-5231, a defendant may move for immunity from prosecution if they have acted in self-defense. Typically, the district court would hold an evidentiary hearing on an immunity motion. The motion should be denied if the State establishes probable cause to believe the defendant did not act in justifiable self-defense. *State v. Collins*, 311 Kan. 418, Syl. ¶ 1, 461 P.3d 828 (2020). The standard imposes a comparatively relaxed, if unusual, burden requiring the State to introduce evidence that would cause a reasonable person to doubt the defendant's claim of self-defense and to fairly entertain a belief in their guilt. 311 Kan. at 426-27.

Here, only Kidwell and the woman had direct knowledge of how she died. Kidwell shattered his own credibility—especially in supporting a motion for self-defense immunity—by giving multiple and wholly inconsistent accounts of the woman's death. See *State v. Donahue*, 218 Kan. 351, 354, 543 P.2d 962 (1975) (false exculpatory statements admissible to show consciousness of guilt); *State v. Knight*, No. 124,198, 2023 WL 4144902, at *2 (Kan. App. 2023) (unpublished opinion) (A factfinder "may properly consider a defendant's resort to false explanations to be evidence of a guilty mind."). In short, Kidwell's serial and contradictory explanations about what happened so undermine his credibility that a motion for self-defense immunity would have been doomed to fail. That's particularly true where one of his accounts depicted him engaging in a criminal homicide. His lawyers did not provide lackluster representation by declining to pursue an untenable legal claim. *Warren v. State*, No. 123,547, 2022 WL 816313, at *3 (Kan. App.

2022) (unpublished opinion) (criminal defense lawyer has "no duty to raise a meritless point").

Kidwell's testimony that he was fearful because of his lawyer's advice that he would face a 50-year sentence if convicted on the second-degree murder charge touches on all three *Edgar* factors and could implicate coercion and mistreatment coupled with a misunderstanding of the plea in addition to the competence of counsel. But the suggestion falls away because the lawyer provided an accurate assessment of the likely punishment. The aggravated presumptive guidelines sentence for intentional second-degree murder for a defendant with a criminal history score of B would have been 618 months or just over 51 years. The low presumptive sentence would have been 554 months or about 46 years. Kidwell's lawyer had a duty to fairly inform him of the potential risks of going to trial, including the likely punishment upon conviction. Given the strong inculpatory evidence against him, Kidwell needed to understand the consequences of putting his fate in the hands of a jury. We have consistently held that a lawyer acts competently in giving their client a reasoned assessment of trying a case—including the potential punishment—even if that is unwelcome news or is delivered in a somewhat unvarnished manner. *State v. Wyatt*, No. 120,489, 2020 WL 6533280, at *3 (Kan. App. 2020) (unpublished opinion); *State v. Gilmore*, No. 118,769, 2020 WL 2296981, at *3 (Kan. App. 2020) (unpublished opinion); *State v. Orona*, No. 118,850, 2019 WL 490523, at *3 (Kan. App. 2019) (unpublished opinion); *State v. Taylor*, No. 112,442, 2015 WL 6835220, at *4 (Kan. App. 2015) (unpublished opinion).

Finally, while Kidwell suggested he was confused at the end of the plea hearing about his likely punishment, we find that to be of little weight in assessing the motion to withdraw his plea. At the hearing on the motion, Kidwell did not testify that he misunderstood the likely sentence he could receive on a conviction for voluntary manslaughter. In short, Kidwell did not assert any confusion about potential punishment as a ground for withdrawing his plea. The State has, nonetheless, latched on to Kidwell's

9

comment at the plea hearing as a reason the plea might be vulnerable to attack, although the record doesn't really support that position.

Toward the end of the plea hearing, Kidwell suggested he was confused about an abstract discussion regarding a possible upward durational departure to yield the agreed-upon 222-month sentence if his criminal history score turned out to be less than B. But Kidwell did not appear to misunderstand the practical effect of a 222-month sentence. He told the district court he expected to serve about an *additional* 10 years and 2 months in prison. And that looks to be roughly accurate. A 222-month sentence translates to 18 and 1/2 years. By the time he was sentenced, Kidwell had accumulated and received jail credit of 2,147 days or nearly 6 years. If Kidwell followed the prison rules, he could expect to receive a good-time reduction of his sentence. Taking account of those present and (possible) future adjustments, Kidwell's assessment was a fair approximation of the time he would serve after sentencing.

In sum, the record developed and presented at the hearing on Kidwell's motion to withdraw his plea fails to support any of the *Edgar* factors. More to the point, given our limited review, we find the district court recognized the controlling legal principles and understood the factual circumstances. We see no abuse of judicial discretion in those respects. We likewise conclude that other district courts would, in comparable circumstances, find no good cause warranting withdrawal of a guilty plea. So we affirm the district court's ruling.

In closing up our discussion, we first mention the peculiar posture of the case in the district court and then comment on our colleague's dissenting view on this point. The adversarial process—a cornerstone of our adjudicatory system—collapsed when it came to Kidwell's motion to withdraw his plea. The process largely depends on the clash of arguments from opposing litigants to fully inform the courts of relevant authority and the disposition of the legal dispute at hand. See *United States v. Cronic*, 466 U.S. 648, 655,

10

104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984) ("'The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.'") (quoting *Herring v. New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 45 L. Ed. 2d 593 [1975]); *State v. Cooper*, 48 Kan. App. 2d 671, 673, 301 P.3d 331 (2013) ("The adversarial system rests, in part, on the notion that competing arguments from opposing sides will define and clarify the court's resolution of the dispute.").

Here, the State abdicated its adversarial role in responding to Kidwell's motion to withdraw his plea. It appears to have done so principally for what it perceived as a tactical advantage if the motion were granted rather than because of some clear legal error requiring that outcome. We decline comment on the ethical propriety of the State's abdication. That falls outside the purview of this appeal. We also do not decide whether the district court had an option to preserve the adversarial integrity of the process. Under K.S.A. 19-711, a district court may appoint a lawyer to act in place of a disabled county attorney—a condition that includes legal disqualification. See *State, ex rel. Aylward v. Kerns*, 210 Kan. 579, 586, 502 P.2d 639 (1972) (recognizing use of K.S.A. 19-711 to appoint substitute for county attorney faced with conflict in case); Kan. Att'y Gen. Op. No. 03-4, 2003 WL 722860 (2003) (K.S.A. 19-711 applies to district attorneys and permits appointment of special prosecutor if district attorney disqualified because of possible conflict of interest).

We now turn to the dissent's conclusion that the district court abused its discretion by applying an inappropriate legal framework to Kidwell's motion to withdraw his plea. The dissent suggests the district court failed to consider the State's acquiescence in Kidwell's motion and impermissibly relied on the *Edgar* factors alone in denying the motion. Neither suggestion holds up. And the dissent tries to bolster its position by overextending the analogy between plea agreements and private contracts to fashion a

11

rule that would require a district court to give substantive weight to such acquiescence regardless of the reason.

The district court plainly recognized that the State chose not to oppose Kidwell's motion and scheduled a hearing to fulfill its independent duty to assess the legal sufficiency of his claims. The district court correctly declined to grant the motion simply because the State joined in Kidwell's request to set aside his plea. *State v. Brown*, 322 Kan. ___, 591 P.3d 141, 143 (2026); see *Hanrahan v. Horn*, 232 Kan. 531, 535, 657 P.2d 561 (1983) (recognizing "a court is not bound by agreements and admissions of the parties as to matters of law or legal conclusions").

Moreover, the State essentially joined in the motion for tactical reasons—to avoid a long delay in going to trial if the motion were denied and that ruling were then reversed on appeal. But the State considered reversal to be a comparatively unlikely outcome and never agreed that Kidwell's plea was infected with error establishing good cause under K.S.A. 22-3210(d)(1). The State's position thus carried little weight in showing that Kidwell had somehow been poorly represented, mistreated, or otherwise taken advantage of in the plea process. Contrary to the dissent's suggestion, the district court did not err in giving the State's articulated concern relatively short shrift in making its independent review of the circumstances and in properly focusing on the *Edgar* factors.

Apart from the State's acquiescence in the motion, neither party nor the dissent has identified any factual circumstance outside of the *Edgar* factors even purportedly bearing on Kidwell's motion. As we have already explained, the hearing record showed that Kidwell failed to establish any of the *Edgar* factors, notwithstanding the State's unwillingness to test his evidence. So there was nothing else for the district court to consider. Standing alone, the State's acquiescence in the motion could not have been enough to grant Kidwell relief unless the dissent now suggests an absolute rule requiring

12

a district court to grant a defendant's unopposed motion to withdraw a plea before sentencing. We do not understand that to be the dissent's position.

Such a rule would conflict with the process prescribed in the Kansas Code of Criminal Procedure for withdrawing a plea before sentencing. K.S.A. 22-3210(d)(1). A district court must find "good cause" to do so. While the *Edgar* factors guide that determination, the district court should consider other relevant circumstances of a given case. *State v. Bilbrey*, 317 Kan. 57, 62-63, 523 P.3d 1078 (2023); *State v. Frazier*, 311 Kan. 378, 381, 461 P.3d 43 (2020). A rule requiring a district court to grant a defendant's motion to withdraw their plea if the State does not actively oppose the request would short-circuit that particularized evaluation process. That sort of categorical condition establishing good cause cannot be found in the statutory language. We do not read statutes that way. *State v. Bryan*, 281 Kan. 157, 159, 130 P.3d 85 (2006) ("A statute should not be read to add language that is not found in it or to exclude language that is found in it."); *State v. Oathout*, 65 Kan. App. 2d 851, 859, 573 P.3d 751 (2025).

So we get to the dissent's suggestion that the district court erred in failing to give substantial evidentiary consideration to the mutual agreement of Kidwell and the State that he ought to be permitted to withdraw his plea. Basically, the dissent welds together the general treatment of plea bargains as being contractual in nature with the particular principle that the parties to a private contract may modify or rescind their contract at any time by mutual agreement to forge a pallid derivative affording some intrinsic or automatic weight to the State's acquiescence in Kidwell's motion. In other words, the dissent offers a curious rule that would require a district court to categorically weigh the mere fact of acquiescence as favoring "good cause" to allow a defendant to withdraw their plea before sentencing regardless of the reason animating the State's position. The dissent does appear to stop short of treating acquiescence as conclusively mandating that a district court grant a defendant's motion. The dissent would, however, reverse and remand here for the district court to apply that rule.

13

Neither Kidwell nor the State advances an argument anything like the dissent's in urging us to reverse the district court. Although that's not determinative—we decide issues rather than merely arbitrating the arguments the parties have made—it is telling. More to the point, however, the dissent offers no legal authority directly supporting the categorical rule it has invented. And the approach cannot be fairly reconciled with the Kansas Supreme Court's directive that district courts independently analyze and resolve legal disputes even when the parties jointly request a particular disposition. *Brown*, 591 P.3d at 143.

A district court obviously should give due consideration to the arguments the parties present on any given issue, including the withdrawal of a plea. But that is quite different from automatically imputing substantive weight to a position simply because the adversaries agree. Here, the dissent's rule seems particularly fragile because the State joined in Kidwell's motion for what it perceived to be a strategic or procedural advantage and not because it perceived the request to have serious legal merit.

The dissent has come to a reductive conclusion that fails to account for material differences between plea bargains in ongoing criminal cases and private contracts between parties to business or personal transactions. And its conclusion does not directly correspond to any recognized contract principle.

The Kansas Supreme Court has acknowledged that plea agreements are contractual in nature. *State v. Urista*, 296 Kan. 576, 583, 293 P.3d 738 (2013). And indeed, they are. The arrangement typically consists of an exchange of interlocking promises calling for the defendant to plead guilty or no contest, thereby relinquishing their right to a trial and its constitutional protections, in exchange for the reduction or dismissal of charges, a sentencing recommendation to the district court, or both. There may be additional terms, such as an agreement on the amount of restitution. The bilateral promises replicate the exchange of consideration in contracts between private parties.

14

Accordingly, contract principles generally guide the construction of plea agreements, especially when a defendant contends the State has failed to fulfill its promises. 296 Kan. at 583 ("'[A] plea agreement is *generally* subject to contract principles[.]'" [Emphasis added.]) (quoting *State v. Copes*, 290 Kan. 209, 217, 224 P.3d 571 [2010]). But the analogy between plea agreements and private contracts is not a perfect one. And that's where the dissent's analysis falls short. See *Urista*, 296 Kan. at 583 (ramifications of plea agreement in resolving criminal case "'may require a different analysis in some circumstances'") (quoting *Copes*, 290 Kan. at 217).

To be sure, parties to a private contract typically may modify or rescind their arrangement at any time by mutual agreement. *Blakesley v. Johnson*, 227 Kan. 495, 501, 608 P.2d 908 (1980); Restatement (Second) of Contracts § 283 (1981); 17B C.J.S. Contracts § 594. A contract between private parties consists of interlocking promises or performances to govern a particular transaction or relationship. The contract functions outside of and without any judicial involvement unless the parties come to an irreconcilable conflict as to the meaning of some part of their agreement or one party ostensibly fails to perform their obligations. The parties are thus generally free to enter into otherwise lawful terms, to modify those terms by agreement, and to mutually terminate the relationship without any judicial review or approval.

But a plea agreement arises and operates quite differently. It represents a subsidiary component—albeit an important one—in an ongoing criminal prosecution unfolding in the district court. The agreement is inextricably tied to a defendant's entry of a plea. The plea process directly involves the district court in securing a valid waiver of the defendant's constitutional rights, accepting the plea, and adjudging the defendant guilty. In that process, the district court vets the plea agreement by acknowledging its primary terms, confirming the defendant's understanding of those terms, and finding the defendant has not been induced to accept the arrangement through extrinsic threats or

15

promises. The parties cannot simply turn back that process and negate the district court's adjudication of the defendant by their mutual consent.

So a plea agreement functions as one piece of an ongoing court proceeding, whereas a private contract exists as a freestanding arrangement independent of any judicial process. The expansive freedom private parties enjoy in entering and managing contractual relationships does not carry over to plea agreements disposing of criminal charges after the district court has adjudicated a defendant guilty based, at least partly, on that agreement. Equating the two, as the dissent does, misapprehends both the investment district courts make in acknowledging those agreements and their purpose in facilitating the disposition of criminal cases.

We certainly recognize that a defendant and the State may modify or rescind a plea agreement before it is submitted to the district court and vetted at a hearing adjudicating the defendant guilty of a specified crime. And, as we have said, a district court ought to give due consideration to concerns the State may voice if a defendant moves to withdraw their plea. But, as the district court correctly recognized here, a district court is ultimately obligated to make an independent evaluation of the merits of a defendant's motion, notwithstanding the State's acquiescence. Those premises are markedly different from the rule the dissent would impose on district courts—requiring them to give some (indeterminate) substantive weight to the State's acquiescence—in evaluating statutory good cause to withdraw a plea.

The dissent seems to compound its erroneous treatment of the State's acquiescence in two ways. First, the dissent mistakenly asserts that the *Edgar* factors are applied the same way whether a defendant tries to withdraw their plea before sentencing or after sentencing. Presentencing withdraw requires "good cause" in the district court's discretion, and postsentencing withdraw requires a more formidable showing of "manifest injustice." K.S.A. 22-3210(d). And, in turn, the dissent concludes those factors

16

necessarily "set[] the bar too high" for showing good cause. Slip op. at 25. But to establish good cause, a defendant need only show their lawyer provided lackluster representation. Conversely, a defendant asking to withdraw their plea after sentencing has to demonstrate their lawyer performed substantially less competently, falling below the standard for adequate representation under the Sixth Amendment to the United States Constitution. See *State v. Herring*, 312 Kan. 192, 198, 474 P.3d 285 (2020); *State v. Aguilar*, 290 Kan. 506, 512-13, 231 P.3d 563 (2010).

As we have suggested, the *Edgar* factors are not neatly compartmentalized and tend to overlap, so inadequate legal representation may also bear on whether a defendant has been misled or taken advantage of or has not fairly understood the plea. *State v. Reu-El*, 306 Kan. 460, 479, 394 P.3d 884 (2017) ("The third *Edgar* factor speaks to the ultimate question—whether a plea was knowingly and voluntarily made—and thereby incorporates the two other *Edgar* factors and any other factors a district court may consider."); *State v. Gray*, No. 123,730, 2022 WL 879744, at *3 (Kan. App. 2022) (unpublished opinion) (In considering the *Edgar* factors, "the competence of a defense lawyer's representation in a case may (and often will) affect whether a defendant has been left uninformed or misled about material factual and legal matters relevant to the decision to enter a plea rather than going to trial."). Contrary to a cornerstone of the dissent, the *Edgar* factors are not monolithically applied to both presentencing and postsentencing motions to withdraw pleas. They are collectively applied in a less demanding fashion to motions to withdraw pleas made before sentencing.

Second, the dissent appears to say that when the State does not oppose a defendant's motion to withdraw their plea before sentencing, the district court may consider only the untested assertions in the motion, the content of the State's written response, and the arguments of the respective lawyers without subjecting the purported grounds to testing in an evidentiary hearing. As this case illustrates, that imposes an unwise embellishment on an already strained novel rule.

17

*Scoring Kidwell's Missouri Convictions for Criminal History*

Kidwell contends the State failed to adequately prove to the district court that his convictions for second-degree assault in Missouri were person felonies for purposes of establishing his criminal history score. As a result, he says they should be treated as nonperson felonies, thereby decreasing his presumptive prison term and requiring us to vacate his sentence. But Kidwell mistakenly allocates the burden of proving criminal history to the State when a defendant challenges that history for the first time on appeal and after agreeing to the history as outlined in the PSI report submitted to the district court. In that posture, the defendant bears the burden of establishing error, and Kidwell has not done so.

There are no disputed facts relevant to Kidwell's criminal history. We treat the issue as a legal one and review without any particular deference to the district court. *State v. Obregon*, 309 Kan. 1267, 1270, 444 P.3d 331 (2019) (classification of convictions for criminal history rests on statutory interpretation and presents question of law); *State v. Mejia*, 58 Kan. App. 2d 229, 231-32, 446 P.3d 1217 (2020). In scoring a defendant's past convictions for criminal history purposes, we apply the substantive rule in effect at the time of the underlying crime of conviction. *State v. Keel*, 302 Kan. 560, Syl. ¶ 9, 357 P.3d 251 (2015).

The version of K.S.A. 21-6811 in effect in July 2018 called for an out-of-state conviction to be treated as a felony if the convicting jurisdiction classified the crime that way. K.S.A. 2018 Supp. 21-6811(e)(2). Nobody disputes that Missouri treats second-degree assault as a felony. Mo. Rev. Stat. § 565.060.3 (2011). The conviction would be treated as a person offense if the out-of-state crime were "comparable" to a Kansas crime designated as a person offense. K.S.A. 2018 Supp. 21-6811(e)(3). In *State v. Wetrich*, 307 Kan. 552, 561-62, 412 P.3d 984 (2018), the court construed comparability to mean that the elements of the out-of-state crime had to be the same as or narrower than the

relevant Kansas offense, as codified at the time the defendant committed the current crime. The *Wetrich* rule applies to Kidwell, even though the Legislature has since amended the substantive test for determining if an out-of-state conviction should be scored as a person offense.

With those principles in mind, we turn to the classification of Kidwell's Missouri convictions for second-degree assault in 2002 and 2012 for criminal history purposes. The relevant version of Mo. Rev. Stat. § 565.060 contains six discrete and independent ways of committing second-degree assault. At least one and likely two of them are comparable under the *Wetrich* test to forms of aggravated battery criminalized in K.S.A. 2018 Supp. 21-5413(b) as person felonies. When the statute governing the out-of-state crime is divisible, the proper comparison rests on the elements of the particular subsection supporting the conviction. See *Obregon*, 309 Kan. at 1273-74.

Under Mo. Rev. Stat. § 565.060.1(3), a person commits assault in the second-degree if he or she "[r]ecklessly causes serious physical injury to another person." That is comparable to K.S.A. 2018 Supp. 21-5413(b)(2)(A) criminalizing "recklessly causing great bodily harm to another person or disfigurement of another person." For criminal purposes, Missouri statutorily defined "serious physical injury" at the time of Kidwell's convictions as "creat[ing] a substantial risk of death or . . . caus[ing] serious disfigurement or protracted loss or impairment of the function of any part of the body." Mo. Rev. Stat. § 556.061(28) (2011). Kansas does not statutorily define "great bodily harm." But the term entails "'more than slight, trivial, minor, or moderate harm, [that] does not include mere bruising, which is likely to be sustained by simple battery.'" *State v. Robinson*, 306 Kan. 1012, 1027, 399 P.3d 194 (2017) (quoting *State v. Green*, 280 Kan. 758, 765, 127 P.3d 241 [2006]). We see no meaningful linguistic differentiation between "serious physical injury" and "great bodily harm," given those legal considerations. Kansas and Missouri have defined "recklessly" as a culpable mental state in the same way. See K.S.A. 2018 Supp. 21-5202(j); Mo. Rev. Stat. § 562.016.4. So

19

when Kidwell was convicted of second-degree assault, Mo. Rev. Stat. § 565.060.3 criminalized the same or narrower conduct than reckless aggravated battery under K.S.A. 21-5413(b)(2)(A).

Similarly, Mo. Rev. Stat. § 565.060.1(5), proscribes "[r]ecklessly caus[ing] physical injury to another person by means of discharge of a firearm." Under K.S.A. 2018 Supp. 21-5413(b)(2)(B), a person commits aggravated battery by "recklessly causing bodily harm to another person with a deadly weapon." Kansas law treats a firearm as one kind of deadly weapon. See *State v. Carter*, 311 Kan. 206, 213, 459 P.3d 186 (2020) (quoting Black's Law Dictionary 1909 [11th ed. 2019]); Black's Law Dictionary 1914 (12th ed. 2024) (defining "deadly weapon" as "[a]ny firearm or other device, instrument, material, or substance that, from the manner in which it is used or is intended to be used, is calculated or likely to produce death"). At the time of Kidwell's convictions, Missouri defined "physical injury" as "physical pain, illness, or any impairment of physical condition." Mo. Rev. Stat. § 556.061(20). Kansas does not define "bodily harm." Unhelpfully, cases have characterized it as something less than great bodily harm entailing "slight" or "trivial" harm, such as "mere bruises." *State v. Dubish*, 234 Kan. 708, 715, 675 P.2d 877 (1984); *State v. Johnson*, 46 Kan. App. 2d 870, 881, 265 P.3d 585 (2011). For purposes of resolving this appeal, we do not need to conclusively decide if Missouri's "physical injury" is the same as or narrower than Kansas' "bodily harm." But they appear to be kindred expressions. See *Midwest Crane & Rigging, LLC v. Kansas Corporation Comm'n*, 306 Kan. 845, 851, 397 P.3d 1205 (2017) (absent statutory definition, words in statute should be given their usual dictionary meaning); *State v. Baumgarner*, 59 Kan. App. 2d 330, 335, 481 P.3d 170 (2021). So that form of aggravated battery is likely broader than second-degree assault as defined in Mo. Rev. Stat. § 565.060.1(5).[*]

[*] A copy of the relevant version of Mo. Rev. Stat. § 565.060 appears at the end of our decision.

Because at least one form of second-degree assault in Missouri was the same as or narrower than reckless aggravated battery, a person felony in Kansas, Kidwell's convictions legally could have been scored as person felonies in determining Kidwell's criminal history score. As we have outlined, Kidwell did not dispute the PSI report's recitation of his criminal history in the district court, and his lawyer agreed his criminal history score was B. The district court relied on those representations in sentencing Kidwell. The dispositive question for us is a procedural one—who now bears the burden of proving Kidwell's criminal history score?

The State bore the initial burden of establishing Kidwell's criminal history and criminal history score. And, as Kidwell now argues, the PSI report alone was insufficient to meet that burden in the face of an objection in that it failed to identify the precise statutory grounds for Kidwell's Missouri convictions for second-degree assault. But Kidwell not only failed to object in the district court, he admitted to having a criminal history score of B. The PSI report coupled with Kidwell's admission satisfied the State's burden in the district court, consistent with K.S.A. 21-6814. The admission encompassed both the historical accuracy of the past convictions listed in the PSI report and their classification as person offenses. *State v. Daniels*, 319 Kan. 340, 346-47, 554 P.3d 629 (2024). With a divisible statute, such as Mo. Rev. Stat. § 565.060, the defendant's admission also amounts to a concession that at least one of the ways of committing the crime satisfies the substantive test in K.S.A. 21-6811(e) for a person offense. 319 Kan. at 349-50.

Under the framework in K.S.A. 21-6814, a defendant's criminal history outlined in the PSI report is legally sufficient unless the defendant "immediately" files an objection upon receipt of the report. K.S.A. 21-6814(b), (c). An objection triggers the State's obligation to produce additional evidence in the district court to overcome the purported error or deficiency in the PSI report. Here, in the absence of an objection, the State was

21

not required to supplement the PSI report, and the district court could rely on the criminal history score compiled in the report.

When a defendant who fails to object to the PSI report before sentencing "later challenges [their] criminal history," the burden of proof "shall shift to [them] to prove [their] criminal history by a preponderance of the evidence." K.S.A. 21-6814(c). Kidwell is in that posture on appeal. He has offered no evidence establishing which subsection or subsections of Mo. Rev. Stat. § 565.060 he was convicted under in 2002 and 2012. He merely offers a legal argument that some of the subsections are broader than any comparable Kansas crime and, therefore, would not satisfy the substantive *Wetrich* test. And while that is true, an abstract legal argument does not substitute for evidence of a necessary historical fact. The argument alone is no more than speculation. Like the defendant in *Daniels*, Kidwell has failed to carry the burden of proof imposed on him at this juncture in K.S.A. 21-6814(c). His point, therefore, also fails.

And like the court in *Daniels*, we do not need to determine if the 2022 amendment to K.S.A. 21-6814 may apply. 319 Kan. at 349-50. The amendment added subsection (d) directing that a defendant challenging their criminal history for the first time on appeal must designate a record showing prejudicial error that would include journal entries and other court documents pertaining to the disputed convictions in their criminal history. Subsection (d) essentially prescribes a specific way for a defendant to satisfy the burden of proof imposed on them in subsection (c). Kidwell offered no evidence, so he met the requirements of neither subsection (c) nor subsection (d). The failure under subjection (c) alone undermines his claim for relief.

*Appealing Pretrial Rulings After Entering a Plea*

In a supplemental brief Kidwell prepared and filed, he contends that the appeal of the district court's denial of his motion to withdraw his plea opens for appellate review

22

the rulings made before he entered the plea. That is, Kidwell says the denial operates as a procedural mechanism allowing him to challenge the district court's adverse decisions on his motions to suppress evidence and his statements to law enforcement, among other rulings. He is mistaken.

A defendant may appeal the denial of a motion to withdraw their plea. But the appellate issue is confined to the propriety of that ruling. The plea and the defendant's adjudication as being guilty of the charged crime statutorily preclude the appeal of any district court rulings preceding the plea. In short, under K.S.A. 22-3602(a), we lack appellate jurisdiction to do what Kidwell asks. *State v. Showalter*, 319 Kan. 147, 172, 553 P.3d 276 (2024); *State v. Smith*, 311 Kan. 109, 121-22, 456 P.3d 1004 (2020).

Affirmed.

* * *

CLINE, J., dissenting: I respectfully dissent from the majority's decision to affirm the district court's denial of Ronald Lee Kidwell's presentence motion to withdraw his plea. I believe the district court abused its discretion by applying an incorrect legal standard—it relied exclusively on the *Edgar* factors to assess whether Kidwell had shown good cause to withdraw his plea. See *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006); see also K.S.A. 22-3210(d)(1) (district court has discretion to allow defendant to withdraw their plea for "good cause shown" at any time before sentencing). But those factors are not the only way to establish good cause, and the court disregarded another option: the parties' mutual agreement that the plea should be withdrawn. See *State v. Bilbrey*, 317 Kan. 57, 62-63, 523 P.3d 1078 (2023) (all three *Edgar* factors need not apply in defendant's favor, and any other relevant factors may support good-cause finding in a particular case).

23

In his motion, Kidwell claimed all three *Edgar* factors supported allowing him to withdraw his plea; that is, he claimed his counsel provided ineffective assistance, he was bullied into accepting the plea, and the plea was not voluntarily and knowingly entered. In addition to these factors, he noted that the State had agreed to allow him to withdraw his plea. In response, the State confirmed it agreed that Kidwell should be allowed to withdraw his plea. It asserted that Kidwell had raised "substantial issues of both fact and law" and said Kidwell's contentions "lend[ed] themselves to concerns about whether this plea was fairly and understandably made, at the very least." In light of the facts and contentions in Kidwell's motion, the State said it did not "feel comfortable going forward with sentencing on the plea agreement." The State noted the "good cause" standard to withdraw a plea is a "low standard," and it did not intend to oppose Kidwell's request to withdraw his plea before the district court or on appeal. It explained that it "was ready for trial leading up to the plea agreement being negotiated and is ready to re-set for trial . . . this calendar year." The State reiterated this point at the hearing on Kidwell's motion, noting the allegations Kidwell made in his motion and in his testimony at the hearing "concern[ed]" the State enough that it "felt it was prudent to go ahead and agree to allow the defendant to get out of this plea agreement and just reset for trial."

When evaluating Kidwell's motion, the district court rejected the parties' mutual consent to withdraw the plea agreement, asserting that it had to find good cause under the *Edgar* factors "regardless of whether the State agrees or not." It also disagreed with the State's assertion that appellate courts look favorably on agreed-upon motions to withdraw a plea, pointing out two cases where our court affirmed a district court's denial of such motions: *State v. Bolin*, No. 75,457, 1997 WL 35435396 (Kan. App. 1997) (unpublished opinion), and *State v. Saenz-Ortiz*, No. 122,970, 2021 WL 4805141 (Kan. App. 2021) (unpublished opinion). I would find both determinations by the district court were legal errors.

24

First, while the *Edgar* factors provide "viable benchmarks" in determining whether a defendant has shown good cause, the Supreme Court has repeatedly emphasized that "[t]hese factors should not, however, be applied mechanically and to the exclusion of other factors." *State v. Fritz*, 299 Kan. 153, 154, 321 P.3d 763 (2014); see also *State v. Schaefer*, 305 Kan. 581, Syl. ¶ 2, 385 P.3d 918 (2016) (Courts "should not ignore other [non-*Edgar*] factors impacting a plea withdrawal that might exist in a particular case.").

One of the reasons the considerations now known as the *Edgar* factors are not the exclusive test for whether a defendant has shown good cause to withdraw a plea relates to their origin. The considerations actually pre-date *Edgar*, and in fact, our Supreme Court has traced their origin to sometime before the adoption of K.S.A. 22-3210 in 1970. *State v. Williams*, 290 Kan. 1050, 1054, 236 P.3d 512 (2010); see *State v. Hill*, 247 Kan. 377, 385, 799 P.2d 997 (1990). They were thus developed by our Supreme Court to help determine whether a defendant should be allowed to withdraw a plea before our Legislature provided guidance on the matter. And, in the past, they were applied to both pre- and post-sentence motions to withdraw a plea. *State v. Aguilar*, 290 Kan. 506, 511, 231 P.3d 563 (2010).

This history is important because K.S.A. 22-3210 sets forth different standards for withdrawing pleas, based on the timing of the request. Defendants who seek to withdraw a plea before sentencing need only show good cause. K.S.A. 22-3210(d)(1). After sentencing, a plea may only be withdrawn "[t]o correct manifest injustice." K.S.A. 22-3210(d)(2). Our Supreme Court has explained that relying exclusively on the *Edgar* factors conflates the lesser good cause standard with the higher manifest injustice standard. *Aguilar*, 290 Kan. at 512-13. In other words, it sets the bar too high for withdrawing pleas before sentencing because the statute only requires a defendant to show good cause at that stage.

Both Kidwell and the State made this point to the district court, arguing the court should not just consider the *Edgar* factors when determining whether Kidwell had shown good cause to withdraw his plea. And both also told the district court—and reminded this court on appeal—that they agreed Kidwell should be allowed to withdraw his plea. On appeal, the State spent eight pages of its brief arguing that we should vacate the plea agreement and remand the case for continued prosecution. It pointed out various aspects of Kidwell's testimony which explained why he lost faith in his trial counsel and felt coerced into accepting the plea and how the district court did not address all of Kidwell's concerns in its ruling. It contended that "[w]hile no issue standing alone might warrant withdrawal of the plea, based on the unique facts of this case, the totality of the circumstances establish good cause to permit Kidwell to withdraw his plea."

Our Supreme Court has directed district courts not to ignore non-*Edgar* factors, but that is exactly what the district court did here. I believe the court erred by only relying on the *Edgar* factors and discounting the parties' agreement, particularly given the contract principles that govern plea agreements and our Supreme Court's frequent reliance on those principles in determining whether such agreements should be enforced.

Kansas appellate courts routinely treat plea agreements as contracts governed by contract law principles. See *State v. Copes*, 290 Kan. 209, 217, 224 P.3d 571 (2010) (Kansas courts apply fundamental contract principles to fairly enforce plea agreements.); see also *State v. Frazier*, 311 Kan. 378, 382, 461 P.3d 43 (2020) ("Plea bargaining agreements are akin to civil contracts and, subject to due process concerns, may be analyzed in a similar fashion."); *State v. Nguyen*, No. 103,920, 2012 WL 603215, at *3 (Kan. App. 2012) (unpublished opinion) ("Because of the contractual nature of plea agreements, the rules of contract law generally apply to their interpretation and operation."). And it is well-settled that the parties to a contract can agree to rescind their contract. See *Boucek v. Boucek*, 297 Kan. 865, 874, 305 P.3d 597 (2013); see *Blakesley v. Johnson*, 227 Kan. 495, Syl. ¶ 2, 608 P.2d 908 (1980) ("Parties to a contract may

26

mutually rescind the transaction although neither party had a right to compel a rescission."). Here, the parties mutually agreed to rescind their plea agreement for the reasons cited in Kidwell's motion. The district court should have considered whether the parties' mutual consent to rescind for the stated reasons constituted good cause to allow Kidwell to withdraw his plea—especially since the State argued the withdrawal would not cause any appreciable delay in the proceedings.

The majority differentiates private contracts and plea agreements in criminal cases to make its point, emphasizing the investment made by the district court when taking the defendant's plea. Yet I believe this generalization creates a distinction without a difference here. The district court's vetting of a defendant's understanding of a plea agreement incorporates the same principles applied to private contracts, such as requiring that contracts are fairly and understandingly made, the parties' consent is genuine, and the object of the contract is legal. This process is important and can provide valuable evidence when determining whether there is good cause to withdraw a plea. But overreliance on it improperly raises the statutory standard for withdrawing a plea. K.S.A. 22-3210(d)(1) allows a defendant to withdraw their plea after entering it on a showing of good cause—it is only after *sentencing* that the standard is raised. K.S.A. 22-3210(d)(2). Additionally, this view improperly discounts circumstances that occur after a plea is entered which could also provide good cause for its withdrawal.

Next, the district court's reliance on *Bolin* and *Saenz-Ortiz* was erroneous because these cases involve situations where a defendant wanted to withdraw a plea after sentencing because the court did not follow the plea agreement or at sentencing when the court told the parties right before the hearing it would not follow the plea agreement. See *Bolin*, 1997 WL 35435396, at *1; *Saenz-Ortiz*, 2021 WL 4805141, at *2. Those withdrawals were subject to the higher manifest injustice standard—not the good cause standard that applied to Kidwell's motion. Further, in *Bolin*, the State did not agree the defendant should be allowed to withdraw his plea—like it did here—it simply did not

27

oppose the defendant's motion to withdraw his plea after the district court failed to follow the sentencing recommendations in the plea agreement. 1997 WL 35435396, at *1.

For these reasons, I would find the district court abused its discretion when denying Kidwell's motion by misapplying the law. See *State v. Schow*, 287 Kan. 529, 541, 197 P.3d 825 (2008) (Noting "to the extent the district court refused to grant the motion to withdraw plea based upon an erroneous understanding of the law, . . . the ruling would be an abuse of discretion."); see also *State v. Schaefer*, 305 Kan. 581, 587, 385 P.3d 918 (2016) (district court's decision must have been based on correct understanding of law to receive full deference of abuse of discretion standard). By specifically disregarding the parties' agreement that Kidwell should be allowed to withdraw his plea for the reasons stated in his motion, the court set the bar artificially higher than K.S.A. 22-3210(d)(1) requires. I believe the district court's decision should be reversed and the case remanded for the district court to apply the appropriate legal standards to determine whether Kidwell established good cause to withdraw his plea. That is, the court should take the parties' agreement to rescind the plea into account when determining whether Kidwell had shown good cause.

**Missouri Statutes Annotated 565.060. Assault, second degree, penalty**

1. A person commits the crime of assault in the second degree if he:

(1) Attempts to kill or knowingly causes or attempts to cause serious physical injury to another person under the influence of sudden passion arising out of adequate cause; or

(2) Attempts to cause or knowingly causes physical injury to another person by means of a deadly weapon or dangerous instrument; or

(3) Recklessly causes serious physical injury to another person; or

(4) While in an intoxicated condition or under the influence of controlled substances or drugs, operates a motor vehicle in this state and, when so operating, acts with criminal negligence to cause physical injury to any other person than himself; or

(5) Recklessly causes physical injury to another person by means of discharge of a firearm; or

(6) Operates a motor vehicle in violation of subsection 2 of section 304.022, and when so operating, acts with criminal negligence to cause physical injury to any person authorized to operate an emergency vehicle, as defined in section 304.022, while such person is in the performance of official duties.

2. The defendant shall have the burden of injecting the issue of influence of sudden passion arising from adequate cause under subdivision (1) of subsection 1 of this section.

3. Assault in the second degree is a class C felony.